Beverly K. **PHELPS**, Administrator of the Estate of Dannie Phelps, Jr.; and Lawrence M. Cason, Administrator of the Estate of Lawrence Michael Cason, Jr. Appellants/Cross–Appellees

v.

**LOUISVILLE WATER COMPANY** Appellee/Cross–Appellant

No. 2001–SC–0472–DG, 2001–SC–1051–DG.

Supreme Court of Kentucky.

April 24, 2003.

F. Thomas Conway, Michael D. Morris, Ronald P. Hillerich, Louisville, for Appellants/Cross–Appellees.

Donald L. Miller II, Christopher M. Mussler, Frost, Brown, Todd, LLC, Laura M. Haara, Brown, Todd & Heyburn, PLLC, for Appellee/Cross–Appellant.

STUMBO, Justice.

Lawrence Michael Cason, Jr. and Dannie Phelps, II were killed on February 19, 1997, when the car they were riding in crashed into a flatbed trailer parked at a Louisville Water Company (LWC) work site on a closed street in Louisville. The estates of both decedents sued LWC for compensatory and punitive damages arising from the accident. A jury awarded a total of $176,361.64 in compensatory damages (after apportioning for relative fault) and $2,000,000 in punitive damages against LWC. The Court of Appeals held that LWC was an agency of the City of Louisville, and as such, fell within the definition of "local government" as defined by Kentucky Revised Statute (KRS) 65.200(3), Claims Against Local Governments Act. The court found that KRS 65.200 et seq. precludes an award of punitive damages against a "local government" and therefore reversed the $2,000,000 punitive award against LWC. We granted Appellants' Motion for Discretionary Review and LWC's Cross–Motion for Discretionary Review and now reverse the Court of Appeals' decision and reinstate the judgment of the Jefferson Circuit Court.

## AGENCY STATUS

The LWC was established as a private corporation pursuant to Chapter 507 of the Acts of the General Assembly of 1854 and operated as such until the City of Louisville purchased all of LWC's shares of stock. Subsequent Acts of the General Assembly provided that the stock was to be held by the sinking fund commission of the City and used as a resource for the payment of the City's bonded debt. In 1906, the legislature created the Board of Waterworks of the City of Louisville (Board) to govern LWC. Now codified as KRS 96.230–.310, the act gave the Board possession, control, and management of LWC's property and operations. Also, in 1908 the LWC transferred legal title to all its property to the City of Louisville to avoid the levy of ad valorem taxes. *See Burkholder v. City of Louisville*, Ky., 276 S.W.2d 29 (1955). Accordingly, the make-up of LWC is as follows: the City of Louisville holds legal title to the physical property; all stock is owned by the City and held in its sinking fund; the Board controls the management and properties of LWC; and LWC itself is still a distinct corporate entity. *Id.* at 31.

The initial act that created LWC, entitled "An Act to incorporate the Louisville Water Company" was approved on March 6, 1854 and read in pertinent part:

Sec. 7. The said corporation is hereby empowered to sell the privilege of using the water which may be conducted through its pipes or aqueducts to any corporation or person, and the said corporation may make all reasonable rules and regulations as to the manner and the times in which said water may be taken and used.

Sec. 8. The city of Louisville may at any time purchase of the said corporation its franchise and all its personal and real property, by paying therefor such a sum as, together with its receipts, will reimburse the whole amount expended, with an annual interest of ten per cent; and from and after the execution of the conveyance the said city of Louisville shall have all the right and be subject to all the duties in this act expressed as to said corporation.

*Dolan v. Louisville Water Co.*, 295 Ky. 291, 174 S.W.2d 425, 429 (1943). The City, however, did not exercise its option to purchase the franchise and assets of the LWC, as allowed by Section 8; rather, the City chose only to purchase the stock of the corporation. *Id.* As a result, the City of Louisville and LWC stand related mere-

ly as shareholder and corporate entity. The legal entity of LWC is completely separate and apart from its shares of stock owned and held by the City of Louisville's sinking fund commission. "[T]he Louisville Water Company now is and has been since its incorporation pursuant to the Act of March 6, 1854, a distinct corporate entity separate and apart from the city of Louisville and under authority of Section 7 of the Act the water company has the legal right to contract with the board of waterworks of the city to furnish the city and its inhabitants with water...." *Id.* at 430.

■ We recognize that our case law has never squarely addressed the issue of whether LWC is an agency of the City of Louisville, but has merely stated as much in dicta. This Court said in *Barber v. City of Louisville*, Ky., 777 S.W.2d 919, 921 (1989) (quoting a Court of Appeals' opinion in *Board of Education of Jefferson County v. Louisville Water Company*, Ky.App., 555 S.W.2d 587 (1977)), that when the legislature in 1906 adopted the act now codified in KRS 96.230–.310, it changed the status of the LWC to that of an agency of the City of Louisville. We, however, find no authority to support this contention. KRS 96.230–.310 merely created the Board of Waterworks to govern the management of for-profit water companies that are wholly-owned by cities of the first class or consolidated local governments. The Court held in *Bell v. City of Louisville*, 32 Ky. L. Rptr. 699, 106 S.W. 862, 863 (1908):

> The act of the General Assembly of Kentucky, approved March 6, 1906, entitled, "An act in relation to the control, management and operation of water works in cities of the first class" (Acts 1906, p. 52, c. 16), does not change the status of the water company towards the city. The changes made are merely as to the management of the water company, and the appointment of its board of directors; but the corporate entity re-

mains, and the shares of stock are still owned by the sinking fund of Louisville.

It is the opinion of this Court that the legislature did not intend to change LWC's status to that of an agency of the City of Louisville when it passed the act now codified as KRS 96.230–.310. It should also be noted that the *Barber* decision, *supra*, was only a plurality opinion of this Court and therefore is not binding precedent. The remainder of Kentucky case law cited by LWC in support of its agency position are Court of Appeals' opinions and are also not binding on this Court.

■ "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *CSX Transportation, Inc. v. First National Bank of Grayson*, Ky.App., 14 S.W.3d 563, 566 (1999) (quoting *McAlister v. Whitford*, Ky., 365 S.W.2d 317, 319 (1962)). "Under Kentucky law, the right to control is considered the most critical element in determining whether an agency relationship exists." *Id.* at 566–567 (quoting *Grant v. Bill Walker Pontiac–GMC, Inc.*, 523 F.2d 1301, 1305 (6th Cir.1975)). KRS 96.260 vests the Board of Waterworks with the control and management of the LWC and its properties:

> The board of waterworks shall be vested with all the authority and privileges, exercise all the franchises, and have possession, control, and management of all the property, of the corporation of which the consolidated local government or city owns all the stock. It may make contracts and sue and be sued, but only in the name of the corporation.

The legislature made clear that the LWC, through the Board, was prohibited from contracting or acting on behalf of the City. Such is not characteristic of an agency

relationship. The language is evidence that the City does not control LWC's contractual endeavors and is therefore not responsible for any liabilities incurred therefrom.

The Board is comprised of six persons, four of which are appointed by the mayor and two of which are appointed by the Jefferson County judge/executive.[1] KRS 96.240. The City of Louisville does not control the LWC; rather, the mayor merely appoints four of the members of the Board, much like voting shareholders of a corporation elect a board of directors. The Restatement (Second) of Agency section 14M (1958) states, "[a] corporation does not become an agent of another merely because a majority of its voting shares is held by the other." In the case at bar, it is clear that the Board controls LWC's day to day operations, with the City "controlling" only through its ability to "vote in" some of that body's members. This relationship alone, does not make the LWC an agent of the City of Louisville. Moreover, LWC does not depend financially on the City and the City is not liable for the debts of LWC. KRS 96.290 states:

> All the existing obligations of the waterworks corporation and all the obligations created by the board of waterworks in the management and operation of the properties and in the performance of its duties, shall be discharged out of the property and rents, earnings, and incomes of the waterworks. The consolidated local government shall not be liable as a municipal corporation for such obligations.

The City does not exercise control over LWC's fiscal matters and any losses incurred by LWC are not imputed to the City and its taxpayers. This is further evidence that the legislature did not intend the LWC to operate as an agent of the City of Louisville. Accordingly, we hold that the LWC is not an agent of the City of Louisville and therefore does not fall within the definition of "local government" pursuant to KRS 65.200(3). As a result, KRS 65.200–2002 does not preclude an award of punitive damages against LWC.[2]

## JURY INSTRUCTIONS

 LWC alleges several errors on cross-appeal. Generally, LWC finds fault with this state's entire common law scheme for awarding punitive damages. More specifically, LWC asserts that it was denied due process when the jury was instructed under the common law gross negligence standard for awarding punitive damages pursuant to *Horton v. Union Light, Heat & Power Co.,* Ky., 690 S.W.2d 382 (1985). LWC maintains that Kentucky's wrongful death statute, KRS 411.130, requires that a defendant acted with malice. KRS 411.130(1) reads in pertinent part: "If the act was willful or the negligence gross, punitive damages may be recovered." According to LWC, the trial court erred when it used the definition of "gross negligence" found in *Horton, supra,* rather than the definition espoused in *Cooper v. Barth,* Ky., 464 S.W.2d 233 (1971), a wrongful death case. In *Cooper,* this Court defined gross negligence as "being something more than the failure to exercise slight care ... there must be an element either of malice or willfulness or such an utter and wanton

---

1. KRS 96.240 has since been amended effective July 15, 2002, and currently vests all appointment authority in the mayor. Our ruling does not address the effect of that statute's amendment on the status of the LWC.

2. We do not reach the issue of whether KRS 65.200–2002 prohibits an award of punitive damages against a local government.

disregard of the rights of others as from which it may be assumed the act was malicious or willful." *Id.* at 234. The definition of gross negligence governing a claim for punitive damages is articulated in *Horton, supra,* as requiring "first ... [a] failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by 'wanton or reckless disregard for the lives, safety or property of others.'" *Id.* at 389–390. It is our opinion that the two definitions are not so dissimilar as to require reversal. Indeed, in *Horton* we quoted the Restatement (Second) of Torts section 908(2) (1979) for stating the rule: "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Id.* at 389. We went on to say, "[t]hus 'evil motive' and 'reckless indifference to the rights of others' are considered as synonymous." *Id.* "[M]alice may be implied from outrageous conduct, and need not be express so long as the conduct is sufficient to evidence conscious wrongdoing." *Id.* (quoting *Fowler v. Mantooth,* Ky., 683 S.W.2d 250 (1984)). "The instructions in a gross negligence case properly define this characteristic as ... misconduct of a character evidencing 'a wanton or reckless disregard for the lives, safety or property of other persons.'" *Id.* We further acknowledged in *Horton* that a "wanton or reckless disregard for the lives, safety or property of others" bears an element "not distinguishable from malice implied from the facts." *Id.* at 389–390. Moreover, this Court has referred to both *Horton* and *Cooper* in conjunction when defining the gross negligence standard to be used in an award for punitive damages. *See City of Middlesboro v. Brown,* Ky., 63 S.W.3d 179, 181 (2001) (stating that the definition of gross negligence found in *Cooper* can be further illuminated by the definition set forth in

*Horton* ). In the case at bar, the jury instructions correctly defined gross negligence as a "wanton or reckless disregard for the safety of other persons." It is not necessary that the jury find LWC acted with express malice; but rather, it is enough that LWC's conduct was so outrageous that malice could be implied from the facts of the situation. Here, the jury was presented with sufficient evidence so that it might infer LWC acted with such reckless disregard for the safety of other persons that malice could be implied from its behavior. The trial court's Opinion and Order enumerated eighteen pieces of evidence that the jury viewed during the trial, including: that LWC misrepresented the situation to the Department of Highways in order to circumvent the permit process; that LWC changed the original detour route without notifying the proper entities; that no traffic control plan was implemented, in violation of LWC's own internal policies and procedures; that there were no advance warning signs at the work zone, in violation of the Manual on Uniform Traffic Control Devices (MUTCD) standards; that improper barricades were placed at the ends of the work zone; and that LWC left only ninety feet of buffer zone between the barricades and the trailer, when MUTCD standards require at least two-hundred twenty feet. From these, and other instances of misconduct, the jury could have easily inferred that LWC committed gross negligence, as that term is defined in *Horton, supra.*

LWC also argues that the correct standard for awarding punitive damages is found in KRS 411.184, which provides that the plaintiff must show that a defendant acted both "with a flagrant indifference to the rights of the plaintiff and with a subjective awareness that such conduct [would] result in human death or bodily

harm." KRS 411.184(1)(c). In *Williams v. Wilson,* Ky., 972 S.W.2d 260 (1998), we held KRS 411.184(1)(c) unconstitutional because it, in effect, abolished the common law right to punitive damages by requiring the defendant to have a subjective awareness that his conduct would result in death or bodily harm. *Williams, supra,* held that the correct standard to be applied was once again common law gross negligence, as defined in *Horton, supra.* Although Appellant's cause of action arose before KRS 411.184(1)(c) had been ruled unconstitutional, when the trial began in late 1998 our decision in *Williams* had been rendered, and according to the record before us, neither party seemed to dispute its applicability. In fact, LWC's tendered instructions on punitive damages set forth the definition of gross negligence found in *Cooper, supra,* and not once during the videotaped conference discussing changes to tendered instructions did LWC argue that KRS 411.184(1)(c) was still applicable. Rule of Civil Procedure (CR) 76.12(4)(c)(iv) mandates that a party indicate how an issue is properly preserved for review by an appellate court. LWC's briefs do not cite to where in the record this issue is preserved and we will not search the vast record on appeal to make that determination. *See Robbins v. Robbins,* Ky.App., 849 S.W.2d 571 (1993); *Ventors v. Watts,* Ky.App., 686 S.W.2d 833 (1985). Accordingly, we hold that the trial court instructed the jury on the correct common law standard of gross negligence, as found in *Horton, supra,* governing claims for punitive damages.

## EXCESSIVENESS OF PUNITIVE DAMAGES

LWC also argues that the amount of punitive damages is grossly excessive under *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In considering the constitutionality of an award of punitive damages, this Court is required to conduct a de novo review of the trial court's determination that the award was not so grossly excessive as to violate due process. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). Accordingly, we analyze the amount of punitive damages under the three criteria articulated by the United States Supreme Court in *Gore, supra:* (1) the degree or reprehensibility of the defendant's conduct; (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the amount of the punitive damages award; and (3) the difference between the punitive damages and the civil penalties authorized or imposed in comparable cases. *Id.* at 574–575, 116 S.Ct. 1589.

The jury heard evidence that LWC's employees intentionally misrepresented the nature of the work being done on Old Third Street so that it could circumvent the permit process and thereafter breached its duty to notify the proper authorities of the road closure. There was also evidence in the record that LWC failed to notify the Department of Highways when it altered the original detour design, and may have never notified Protection Services, Inc. (the corporation responsible for delivery and set-up of barricades) of the proposed detour route. Further, the employees of LWC declined an offer to park the trailer in a nearby church parking lot, but instead chose to leave it in the middle of the road in violation of MUTCD regulations. LWC employees also testified that they left the trailer in the road to protect an excavation site, but there was contradicting evidence that the trailer was not near the excavation site and that there was already heavy equipment in place for such purpose. There were also no advance

warning signs in place at the work site, in violation of MUTCD regulations; improper barricades had been placed by LWC; an improper buffer zone was maintained between the trailer and barricades; and no proper traffic control plan had ever been implemented by LWC. There was also evidence that LWC only held one traffic safety meeting a year, and LWC maintained throughout the trial that it did not have responsibility for its own traffic control. The trial court, in fact, logged numerous instances of misconduct on the part of LWC and Protection Services, Inc., in its Opinion and Order. While we are required to review the excessiveness of the award pursuant to the factors articulated in *Gore* de novo, "it of course remains true that [appellate courts] should defer to the [trial court's] findings of fact unless they are clearly erroneous." *Cooper Industries, supra,* 532 U.S. at 440, 121 S.Ct. 1678. Therefore, we conclude that the degree of reprehensibility of LWC's behavior was substantial, as each of the aforementioned factors played a part in causing the death of two teenage boys.

Secondly, we must consider the disparity between the harm suffered by the plaintiffs and the amount of punitive damages awarded. The harm suffered by Dannie Phelps, II, and Lawrence Michael Cason, Jr., was death. The harm to the plaintiffs, the boys' parents and administrators of their estates, was a loss of earning power, and more importantly, a loss of the companionship and the chance to see their sons grow to be healthy and productive adults. The harm was catastrophic. The jury awarded $150,000 for loss of earning power to both estates; and $5,317 and $15,340.53 in funeral expenses for Lawrence Michael Cason, Jr., and Dannie

Phelps, II, respectively. The jury apportioned fault in the following manner: LWC, fifty-five percent (55%); Protection Services, Inc., ten percent (10%); Lawrence Michael Cason, Jr., twenty-five percent (25%); and Dannie Phelps, II, ten percent (10%). Therefore, the estate of Lawrence Michael Cason, Jr., received $85,424.35 in compensatory damages from LWC, and the estate of Dannie Phelps, II, received $90,937.29 in compensation from LWC. The jury awarded $2,000,000 in punitive damages against LWC which was not apportioned for relative fault.[3] The amount of punitive damages awarded was a little more than eleven times the amount of compensatory damages awarded after apportioning for relative fault. The Supreme Court has consistently maintained that there is no mathematical bright line rule for comparing punitive and compensatory damages. *Gore, supra,* 517 U.S. at 582–583, 116 S.Ct. 1589. While several of this Court's opinions have approved ratios less than present here, we take note of the relatively small amount of compensatory damages awarded for each boy's loss of income ($150,000), and the fact that several of our other opinions did not involve the loss of life. *See Sand Hill Energy, Inc. v. Ford Motor Co.,* Ky., 83 S.W.3d 483 (2002) (awarding $15,000,000 in punitive damages and $3,000,000 in compensatory damages for a wrongful death claim); *Farmland Mutual Insurance v. Johnson,* Ky., 36 S.W.3d 368 (2000) (awarding $2,000,000 in punitive damages, $71,013 in compensatory damages, and $213,810 for the actual cash value of property lost due to fire, for violations of the Kentucky Unfair Claims Settlement Practices Act); *Owens–Corning Fiberglas Corp. v. Golightly,* Ky., 976 S.W.2d 409 (1998) (awarding $435,000 in

---

**3.** The jury awarded punitive damages against Protection Services, Inc., in the amount of

$325,000 and it has not appealed this award.

punitive damages and $290,000 compensatory damages for a products liability action).

We must keep in mind that the purpose of punitive damages is to punish and deter a defendant's misconduct. A reasonable ratio in one instance may frustrate this purpose if a plaintiff's compensatory damages are particularly small. "Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore, supra,* 517 U.S. at 582, 116 S.Ct. 1589. We feel that the egregiousness of LWC's actions and the minimal amount awarded to compensate the victims' families support the amount of punitive damages imposed by the jury in this case.

Lastly, we must examine the civil or criminal penalties that could be imposed for comparable misconduct. LWC argues that it had no notice that it might be subject to "punishment of this magnitude" because it thought its conduct was governed by the "fraud, oppression or malice" standard contained in KRS 411.184, rather than the gross negligence standard contained in the jury instructions. This argument is unavailing. LWC surely was on notice that failure to properly close a public roadway in Louisville could result in severe injury or loss of life whether the applicable statute read "fraud, oppression or malice" or "wanton or reckless disregard for the safety of other persons." Notice is satisfied for due process purposes "if prior law fairly indicated that a punitive damages award might be imposed in response to egregiously tortious conduct." *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 466, 113 S.Ct. 2711, 2724, 125 L.Ed.2d 366, 384 (1993). LWC should have known that a failure to

discharge its statutorily mandated duties regarding road closures could subject it to severe penalties resulting from a claim for wrongful death. LWC also contends that the maximum penalty for "improperly setting up traffic control (at worst)" is a $100 fine under KRS 189.337 and KRS 189.990(1). While this may be the maximum fine for a failure to properly follow the Department of Highways' "manual of standards and specifications for a uniform system of official traffic control devices," it is not the only penalty to which LWC is subject when its gross negligence in failure to obtain the proper permits, failure to notify the proper authorities when closing a public road, and failure to provide adequate barricades, causes the death of two young men. LWC is well aware of the possible ramifications of the negligence of its employees, as it has been the subject of numerous civil actions for damages for personal injury and property damage over the years. *See, e.g., City of Louisville v. Stuckenborg,* Ky., 438 S.W.2d 94 (1968); *Louisville Water Co. v. Bosler,* Ky., 433 S.W.2d 105 (1968); *Louisville Water Co. v. Cook,* Ky., 430 S.W.2d 322 (1968); *Stein v. Louisville Water Co.,* Ky., 249 S.W.2d 750 (1952); *Louisville Water Co. v. Robinson,* 312 Ky. 786, 228 S.W.2d 444 (1950); *Felsway Shoe Corp. v. Louisville Water Co.,* 311 Ky. 259, 223 S.W.2d 875 (1949). Accordingly, we conclude that LWC had or should have had notice that it may have been subject to a claim for significant damages if its gross negligence caused the death of two people.

After weighing all of the factors articulated in *Gore, supra,* we therefore conclude that the $2,000,000 punitive damages award against LWC is not so grossly excessive as to violate the Due Process Clause. We also do not find any evidence indicating that the jury's award of damages was the result of passion and preju-

dice. "The test of excessiveness is whether the award is so great as to strike the mind at first blush as being the result of passion and prejudice." *Koch v. Stone,* Ky., 332 S.W.2d 529, 532 (1960). The small amount of compensatory damages awarded is likely the result of the two victims' past employment records and the jury's belief that their earning power would have been minimal. Clearly the jury did not feel the deterrent effect of punitive damages would be accomplished by awarding a lower amount.

LWC also faults Kentucky's common law system of punitive damages, and the trial court's instructions on punitive damages, as not advancing this state's policy concerns of punishing the wrongdoer and deterring similar conduct in the future. *See Hanson v. American National Bank & Trust Co.,* Ky., 865 S.W.2d 302 (1993). Oddly enough, LWC's own tendered instructions on punitive damages also did not contain a statement regarding the purpose of punitive damages and we are not referred to anywhere in the record that this issue is preserved. Therefore, we decline to address this issue on appeal.

### DECEDENTS' RECKLESSNESS

■ LWC contends that Appellants are barred from recovering damages due to LWC's gross negligence because the decedents' own conduct was reckless as a matter of law. This "rule of recklessness," LWC argues, is firmly entrenched in Kentucky law. *Hilen v. Hays,* Ky., 673 S.W.2d 713 (1984) marked this state's recognition that contributory negligence of a plaintiff was no longer a total bar to his recovery. We now recognize a comparative fault defense to tort actions and reduce compensatory damages according to that percentage of the plaintiff's fault. *Id.* at 720. This was done in the case at bar. The jury apportioned relative fault among

the parties and the Appellants' compensatory damages were reduced accordingly. LWC's ultimate argument here is that the punitive damages award should have been apportioned as well. However, LWC's tendered instructions to the trial court did not request an apportionment of fault between the parties and we are directed to nowhere in the record where this issue has been preserved. Therefore, we decline to address this issue further.

### SUBSEQUENT REMEDIAL MEASURES

LWC alleges the trial court erred in allowing evidence that LWC ordered additional traffic control equipment to the scene after the accident occurred. Kentucky Rule of Evidence (KRE) 407 states:

When, after an event, measures are taken which, if taken previously, would have made an injury or harm allegedly caused by the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence in connection with the event. This rule does not require the exclusion of evidence of subsequent measures in products liability cases or when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Appellants contend that the evidence was offered to show LWC, not Protection Services, Inc., who was also a named party to this action, was responsible for ordering the proper equipment. The trial judge concluded that the issue of who had control of the worksite was hotly contested throughout the trial and thus allowed in the evidence. Appellants also state that they questioned a LWC employee regarding the proper equipment to be placed at the site, and it was during an attempt to impeach this witness that they attempted

to show that different equipment had, in fact, been placed after the accident. The trial judge overruled LWC's motion for a mistrial. We do not find this ruling to be an abuse of discretion. The trial judge is in the best position to view this evidence and therefore we will defer to her judgment.

## CONCLUSION

For the reasons set forth above, the opinion of the Court of Appeals is reversed, the judgment of the Jefferson Circuit Court is hereby reinstated, and the punitive damages award is allowed to stand.

LAMBERT, C.J., JOHNSTONE, KELLER and WINTERSHEIMER, JJ., concur.

JOHNSTONE, J., concurs, writing separately, with STUMBO and WINTERSHEIMER, JJ., joining.

COOPER, J., dissents by separate opinion in which GRAVES, J., joins.

JOHNSTONE, Justice, concurring.

While I concur fully with the majority, I write separately to address the Louisville Water Company's ("LWC") argument that punitive damages cannot be assessed against it under the common law.

The crux of the LWC's argument on this issue is that it is a municipal corporation and, under the common law, punitive damages are not allowed against a municipal corporation unless expressly provided by statute. There are several flaws to this argument. First, there is no support for the claim that punitive damages are not permitted against municipal corporations under the common law of Kentucky. Next, even if Kentucky common law did prohibit assessment of punitive damages against municipal corporations, this prohibition would not apply to the LWC. Final-ly, any common-law prohibition against awarding punitive damages would not apply in a statutory wrongful death case such as the case at bar.

## I. Punitive Damages are Available Against Municipal Corporations in Kentucky

The LWC fails to cite a single Kentucky case holding that punitive damages are not permitted against municipal corporations. Rather, it relies on *City of Newport, et al. v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), which states in pertinent part:

> By the time Congress enacted what is now § 1983, the immunity of a municipal corporation from punitive damages at common law was not open to serious question. It was generally understood by 1871 that a municipality, like a private corporation, was to be treated as a natural person subject to suit for a wide range of tortious activity, but this understanding did not extend to the award of punitive or exemplary damages. Indeed, the courts that had considered the issue prior to 1871 were virtually unanimous in denying such damages against a municipal corporation. Judicial disinclination to award punitive damages against a municipality has persisted to the present day in the vast majority of jurisdictions

*Id.* at 259–60, 101 S.Ct. at 2756, 69 L.Ed.2d at 627 (internal citations omitted). But the *City of Newport* Court did not cite to any Kentucky case, either directly or indirectly, as authority for this "general rule." Most likely this is because there is none.

The only Kentucky case that raises the question of whether punitive damages are permitted against a municipal corporation leaves the question open. "Without passing upon the question of whether or not

averments might be made under which the city would be responsible in punitive damages, it is sufficient to say that such averments are not made in the petition in this case. . . ." *Clayton v. City of Henderson,* 103 Ky. 228, 44 S.W. 667, 669 (1898). Further, cases following *Clayton* involving punitive damages against a city imply that punitive damages are available against a city, because municipal immunity from punitive damages is never mentioned as a defense. *See, e.g., City of Covington v. Faulhaber, et al.,* 178 Ky. 586, 199 S.W. 32 (1917); *City of Middlesboro v. Brown,* Ky., 63 S.W.3d 179 (2001). Therefore, I conclude that punitive damages are available against a municipal corporation under Kentucky law. But even if Kentucky followed the "general rule" set forth in *City of Newport,* the "general rule" does not shield the LWC from punitive damages.

## II. The LWC is not a Municipal Corporation Within the Meaning of the General Rule

The term "municipal corporation" can be defined narrowly or broadly. *See* 56 Am. Jur.2d, *Municipal Corporations, Counties, and Other Political Subdivisions,* § 1 (2002) ("Under the law of some states, the term 'municipal corporation' means not merely a city, but refers generally to any local government entity created by the state to carry out designated functions."). Kentucky law defines the term broadly. *Id.,* citing *Kentucky Center for the Arts v. Berns,* Ky., 801 S.W.2d 327 (1990). The policy reasons behind the "general rule" support limiting its application to those entities falling within the narrow definition of the term "municipal corporation."

Under the "general rule," "[p]unitive damages may not be recovered against such *governmental entities* as municipal corporations, school districts, cities, counties, or the state and its political subdivisions." 57 Am.Jur.2d, *Municipal, County,*

*School, and State Tort Liability,* § 648 (2002) (emphasis added). This rule is founded on public policy:

Because the burden of a punitive damages award against a municipality ultimately falls on the taxpayers, and thus will fail to deter future harmful activity by the municipality itself, punitive damages are not usually recoverable against a municipality. Similarly, punitive damages may not be awarded against a county because taxpaying citizens would be punished for the acts of public officials

*Id.* at § 651. Shielding the non-governmental LWC from punitive damages does not further this public policy.

The burden of the punitive damages award against the LWC will not borne by the taxpayers of Louisville in the form of higher taxes or reduced services. If passed on, the burden will fall on the LWC's customers. While most of these customers will also probably be Louisville taxpayers, this is coincidence and not of consequence. The burden will not fall on Louisvillians as taxpayers, but rather as customers of the LWC. This distinction is important. Otherwise, public policy would support extending immunity from punitive damages to all public utilities and to any business entity which holds a monopoly over an important service or product. But this is not the case. *See, e.g., Kentucky Utilities Co. v. Jennings,* Ky.App., 549 S.W.2d 528 (1977) (affirming a punitive damages award against Kentucky Utilities Co.). Thus, the policy reasons for shielding municipalities and counties from punitive damages do not apply to extending the shield to cover the LWC.

## III. The Statutory Right to Punitive Damages in a Wrongful Death Case Trumps the Common–Law

The only legal entitlement to recover damages for wrongful death in Kentucky

is provided by Section 241 of the Constitution and KRS 411.130. There is not and never has been a common law right of action for wrongful death in Kentucky. *Smith's Adm'r v. National Coal & Iron Co.*, 135 Ky. 671, 117 S.W. 280, 281 (1909); *Eden v. Lexington & Frankfort R.R. Co.*, 53 Ky. (14 B.Mon.) 204, 205 (1853). "The maxim, 'Actio personalis moritur cum persona,' was the uniform rule of the common law, and prevails in Kentucky today (sic), except where it has been modified by the express language of the Constitution and statute." *Gregory v. Illinois Cent. R. Co.*, Ky., 80 S.W. 795 (1904). Section 241 creates a right of action for damages for wrongful death and provides that "[t]he General Assembly may provide how the recovery shall go and to whom belong...."

*Robertson v. Vinson*, Ky., 58 S.W.3d 432, 435 (2001) (Cooper, J. concurring).

In providing how "the recovery [for wrongful death] shall go" the General Assembly declared that punitive damages may be recovered if "the act was willful or the negligence gross." KRS 411.130(1). This statute trumps common-law municipal immunity. *See, e.g., City of Louisville v. Hart's Adm'r*, 143 Ky. 171, 136 S.W. 212 (1911) (affirming a judgment for wrongful death brought against city under KRS 411.130); *Spangler's Adm'r v. City of Middlesboro*, 301 Ky. 237, 191 S.W.2d 414 (1945) (holding that the 90-day notice contained in KRS 411.110 is not controlling in a wrongful death case brought against city under KRS 411.130). It also trumps the common-law prohibition that precludes punitive damages against a municipal corporation (assuming that the prohibition exists in Kentucky). *See City of Lexington v. Lewis's Administratrix*, 73 Ky. 677, 10 Bush 677 (1875) (Reversing a punitive damages award against city for wrongful death obtained under predecessor statute for failure to charge "willful neglect," without mentioning the city's "general rule" defense against punitive damages.). Therefore, any common-law immunity defense the LWC had against the punitive damages award was abrogated by KRS 411.130.

## IV. Conclusion

Kentucky common law does not follow the "general rule" announced by the U.S. Supreme Court in *City of Newport* that prohibits the imposition of punitive damages against a municipal corporation. Even if it did, the LWC would not benefit from the common-law rule. Moreover, any common-law prohibition would have to yield to the statutory right to seek punitive damages in a wrongful death case. Therefore, I conclude that there is no statutory or common-law bar that precludes the punitive damages award against the LWC and that the punitive damages award against the LWC was proper for the reasons stated in the majority opinion.

STUMBO and WINTERSHEIMER, JJ., join this concurring opinion.

COOPER, Justice, dissenting.

I agree with the majority opinion's conclusion that the Louisville Water Company is not an agency of the City of Louisville, thus leaving for another day the issue of the constitutionality of KRS 65.2001 as applied to municipalities by KRS 65.200(3). *But, cf. Yanero v. Davis*, Ky., 65 S.W.3d 510, 525 (2001) ("[T]o the extent that the 1986 amendments to the Board of Claims Act could be construed as attempts to limit the liability of non-immune persons or entities to the liability limits set forth in KRS 44.070(5), those provisions would violate Section 54 of the Constitution.").

However, I would reverse this case primarily because of the trial court's failure

to instruct the jury on punitive damages in accordance with KRS 411.130(1), as interpreted in *Cooper v. Barth,* Ky., 464 S.W.2d 233, 234 (1971). *Williams v. Wilson,* Ky., 972 S.W.2d 260, 270 (1998) (Cooper, J., dissenting) ("Never before have we questioned the authority of the General Assembly to enact statutes establishing the degree of culpability necessary to entitle a litigant to recover punitive damages."). Particularly fallacious is the majority opinion's equation of "malice or willfulness," *Cooper v. Barth, supra,* at 234 (citing *Sistrunk v. Meisenheimer,* 205 Ky. 254, 265 S.W. 467, 468 (1924) and *Cadle v. McHargue,* 249 Ky. 385, 60 S.W.2d 973, 974 (1933)), with "wanton or reckless disregard," *Horton v. Union Light, Heat & Power Co.,* Ky., 690 S.W.2d 382, 389–90 (1985).

Further, even if the jury had awarded the same punitive damages ($2,000,000.00) under a proper instruction, the award is patently excessive under the facts of this case. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574–75, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991); *Sand Hill Energy, Inc. v. Ford Motor Co.,* Ky., 83 S.W.3d 483, 512–14 (2002) (Cooper, J., dissenting). Applying the test enunciated in *Gore, supra,* to the *de novo* review required by *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 436–43, 121 S.Ct. 1678, 1685–89, 149 L.Ed.2d 674 (2001), the evidence in this case warranted an award of punitive damages of, at most, $500,000.00; therefore, the award should be reduced to a sum no more than that amount. *State Farm Mut. Auto. Ins. Co. v. Campbell,* — U.S. ——, slip op., at 15, 123 S.Ct. 1513, —— (2003) ("When compensatory damages are substantial, then a lesser ratio [of punitive to compensatory damages], perhaps only equal to compensatory damages,

can reach the outermost limit of the due process guarantee.").

Accordingly, I would reverse and remand this case for a new trial on the issue of punitive damages.

GRAVES, J., joins this dissenting opinion.